*12-1686-cv(L)*
*Raspardo v. Carlone*

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2012
No. 12-1686-CV; 12-1870-CV

JENNIFER RASPARDO, NEEDASABRINA RUSSELL, GINA SPRING,
*Plaintiffs-Appellees,*

*v.*

JOHN CARLONE, WILLIAM GAGLIARDI, THOMAS STECK, KENNETH
PANETTA, ANTHONY PAVENTI,
*Defendants-Appellants,*

CITY OF NEW BRITAIN, NEW BRITAIN POLICE DEPARTMENT,
*Defendants.*[*]

Appeal from the United States District Court
for the District of Connecticut.
No. 9-CV-1321 — Alvin W. Thompson, *Judge.*

ARGUED: JUNE 28, 2013
DECIDED: OCTOBER 6, 2014

---

[*] The Clerk is requested to amend the caption to conform to the caption above.

_____

Before: WINTER, LYNCH, and DRONEY, *Circuit Judges.*

_____

Appeal from orders of the United States District Court for the District of Connecticut (Alvin W. Thompson, *Judge*) denying the defendant police supervisors' motions for summary judgment in the plaintiffs' employment discrimination action brought pursuant to 42 U.S.C. § 1983. We agree with the district court that Defendant Carlone is not entitled to qualified immunity on Plaintiff Raspardo's hostile work environment claim. We conclude, however, that the defendants are protected by qualified immunity in all other respects. Accordingly, we **AFFIRM** in part, **REVERSE** in part, and **REMAND**.

_____

ALEXANDRIA L. VOCCIO, Howd & Ludorf, LLC, Hartford, Connecticut, *for Defendant-Appellant John Carlone.*

JOSEPH W. MCQUADE, Kainen, Escalera & McHale, P.C., Hartford, Connecticut, *for Defendant-Appellant Anthony Paventi.*

IRENA J. URBANIAK (Joseph E. Skelly, Jr., *on the brief*), Office of the Corporation Counsel, City of New Britain, New Britain,

Connecticut, *for Defendants-Appellants*.

NORMAN A. PATTIS, The Pattis Law Firm, LLC, Bethany, Connecticut, *for Plaintiffs-Appellees*.

DRONEY, *Circuit Judge*:

Plaintiffs-Appellees (the "plaintiffs"), two former and one current female New Britain police officers, brought suit in the United States District Court for the District of Connecticut against the City of New Britain, its police department, the police union, and five individual police supervisors under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, 42 U.S.C. § 1983, and other federal and state laws. The plaintiffs alleged that the five supervisors discriminated against them on the basis of sex by creating a hostile work environment and disparate treatment. Those individual defendants moved for summary judgment on the basis of qualified immunity, but the district court (Alvin W. Thompson, *J.*), denied

3

their motions.[1] The five individual defendants contend here, as they did before the district court, that they are entitled to qualified immunity. For the reasons that follow, we AFFIRM in part and REVERSE in part the district court's denial of the individual defendants' motions for summary judgment and REMAND for proceedings consistent with this opinion.

**BACKGROUND**

**I.    The Plaintiffs' Claims of Sexual Harassment and Disparate Treatment**

The New Britain Police Department ("NBPD" or the "department") hired Plaintiff Gina Spring on January 28, 2005, and Plaintiffs Jennifer Raspardo and Needasabrina Russell in August of

---

[1] Carlone filed his own motion for summary judgment, and the four other individual defendants moved collectively for summary judgment in a separate motion. The district court issued its orders deciding the two motions on the same day, March, 29, 2012, but addressed Carlone's motion for summary judgment in one order and the remaining defendants' motion in another order. Carlone's notice of appeal was docketed on April 24, 2012 on docket 12-1686; the other defendants' notice of appeal was docketed on May 1, 2012 on docket 12-1870. Thus, although the district court docket number is identical for all of the defendants, the defendants' appeals generated two appellate dockets, which are considered here in tandem.

4

2006.  Spring resigned from the NBPD on August 21, 2008, when she accepted a position with the City of Torrington Police Department. Russell went on Family and Medical Leave Act ("FMLA") leave in 2008 and never returned to active duty, ultimately leaving the NBPD permanently in 2010.  Raspardo remained an NBPD officer at the time of the filing of this suit.  The five defendants in this appeal were at all times supervisory police officers in the NBPD.

The plaintiffs' claims against these defendants are best understood by dividing them into two categories.  First, each of the plaintiffs alleges that John Carlone, a sergeant in the NBPD and their direct supervisor, sexually harassed them through inappropriate jokes, comments, and other behavior, including unwanted physical contact with Raspardo and Russell, which created a hostile work environment.  Second, the plaintiffs allege that the four other individual defendants created a hostile work environment and subjected them to disparate treatment by making inappropriate

comments, failing to adequately report or investigate Carlone's harassing behavior, and disciplining the plaintiffs more harshly for violations of NBPD policies than male officers. Most of the events occurred between early 2007 and early 2008.

We first address the claims against Carlone before turning to the claims against the four other defendants.

*A. The Plaintiffs' Claims Regarding Carlone*

1. Spring's Claims

Spring complains principally of two incidents involving Carlone. First, in 2007, Carlone and Spring responded separately to a police call concerning a report of a naked woman. En route to the scene, Carlone sent Spring a message via his mobile data terminal ("MDT")[2] that she "would be perfect" for responding to the call. Carlone then sent Spring additional messages, the substance of which she could not recall at the time of discovery in this action, but

---

[2] The MDT system allows officers to communicate with each other by way of text messages sent through computer systems in their cars.

that she also thought were inappropriate. Spring did not respond to the messages and had no issues with Carlone at the scene. Second, throughout her time under Carlone's supervision, Carlone gave Spring rides in his police cruiser while she was walking a beat. During these occasions, Carlone asked questions about Spring's dating history, which she found uncomfortable, but she did not otherwise perceive Carlone's actions to be inappropriate.

While she was under Carlone's supervision, Carlone would also call Spring "Brown Eyes" and sing the song "Brown Eyed Girl"[3] around her, but Spring did not interpret this as harassment at the time. Spring now asserts that this nickname refers to "a female who participates in anal sex."[4] Defs.' App. 116.

Spring never observed Carlone act inappropriately with other

---

[3] "Brown Eyed Girl" is a copyrighted romantic song by Van Morrison.

[4] Spring also learned after Carlone was placed on leave that Defendant Paventi had previously ordered Carlone not to give rides to female police officers in his patrol vehicle, that Carlone had called her "Brown Eye" in an MDT message to another male officer, and that Carlone had commented to others on the size of her breasts and her sexual proficiency.

female officers and does not allege that he had any physical contact with her. Spring never made a formal administrative complaint with the department. She filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") in September of 2008, while Carlone was under investigation by the NBPD for his misconduct.

2. Raspardo's Claims

Raspardo details four principal incidents. First, in the summer of 2007, after responding to a call, Carlone asked Raspardo if she had plans for the night. She told him that she did not, and Carlone asked her if she was "planning to go out drinking or have sex with [her] boyfriend," who was also an officer in the department. Raspardo asked if she was free to go and left immediately. Second, during that same summer, Carlone told Raspardo that her uniform was too big and should be more form-fitting. Third, at some point in 2007, Carlone approached Raspardo in the roll call room where she was writing a report and attempted

8

to massage her shoulders. When Raspardo shrugged her shoulders, indicating that she was uncomfortable, Carlone stopped. Fourth, in April of 2008, Raspardo approached the main police desk (where Carlone was sitting) to sign a report. Carlone removed a magazine from a drawer and showed Raspardo a picture of a woman wearing law enforcement tactical gear; the woman's clothing was tight, and the photograph was focused on her buttocks. Carlone then passed the photo around to other male officers and said that the woman's buttocks looked like Raspardo's buttocks. Raspardo told Carlone that his comment was not funny and left immediately.

Raspardo also represents that Carlone made inappropriate comments to her while she was on field training from January to April of 2007, but she fails to provide any specific details about these comments. Finally, Raspardo also claims that Carlone "said things [of a sexual nature] that made [Raspardo] uncomfortable and angry." Pl. Carlone's App. 4. Specifically, Raspardo asserts that

9

Carlone "made references to [her] body parts on at least over ten occasions." *Id.* at 5. In a statement provided during the NBPD investigation of Carlone in May 2008, Raspardo explained:

> Mainly Sergeant Carlone would make comments about my butt. These comments were random. Sometimes it was when we were one on one and sometimes it was when people were passing by. These comments made me feel disrespected, angry, and embarrassed. The comments were inappropriate. I took these comments as sexual in nature and not related to work in any way. I would say things like "that isn't funny" or just walk away.

*Id.* When questioned about Carlone's comments at her deposition and in interrogatories, Raspardo confirmed that Carlone made them while he was her supervisor between 2007 and 2008, but she could provide few additional details.

Raspardo does not allege that Carlone sexually propositioned her, and she never observed Carlone sexually harass other female officers. Although *Russell* stated that she heard Carlone make other offensive comments about Raspardo's body and her dating history, Raspardo concedes that she learned of these additional comments

10

only after Chief William Gagliardi ("Gagliardi") placed Carlone on administrative leave in May 2008 while the NBPD was investigating him. Raspardo did not report Carlone's conduct to the NBPD until after he had been placed on leave. She did not lodge an internal complaint with the NBPD concerning the alleged sexual harassment, but she did complete a sworn statement during the department's investigation of Carlone in May of 2008, which included his inappropriate conduct toward her. Raspardo ultimately filed a complaint with the CHRO in September of 2008.

### 3. Russell's Claims

Carlone did not move for summary judgment as to Russell's sexual harassment claim in the district court. Thus, Russell's claim against Carlone is not before us. Russell's complaints regarding his behavior have some relevance, however, with relation to her claims against the other defendants, and are considered in that context.

Prior to joining the NBPD, Russell had a consensual sexual relationship with Carlone, which ended when she learned that he

11

was married. When Carlone learned that Russell had been hired by the NBPD, he congratulated her and told her that she could now "drive him around and he [could] do sexual things to [her]." Pl. Carlone's App. 31. Russell told Carlone that this would not happen. Once Russell became an officer under Carlone's supervision, Carlone began making inappropriate and lewd comments regarding her body and appearance. Carlone's comments about Russell's body soon became much more frequent and sexually explicit. Carlone then began reprimanding and disciplining Russell harshly for alleged work performance issues. Carlone also started a rumor that Russell was having a sexual relationship with another officer and embarrassed her in front of other officers several times. In July of 2007, Carlone forced Russell to perform a sexual act. Carlone's sexual harassment of Russell and criticism of her performance as an officer continued for some period after this. Russell reported her allegations against Carlone in May 2008, but did not file a formal

12

internal complaint with the department concerning any alleged sexual harassment. Russell filed a complaint with the CHRO in September of 2008.

4. Reports of Carlone's Behavior and Department Investigation

As mentioned above, Spring, Raspardo, and Russell did not initially report sexually harassing conduct by Carlone to the NBPD. In late April 2008, however, another officer, Armando Elias, reported that Carlone made an inappropriate racial comment to him. The department immediately began an investigation of Carlone's conduct toward his subordinate officers. During the course of this investigation, on May 2, 2008, Russell reported Carlone's inappropriate behavior, including the July 2007 sexual act. As a result, the department consulted with the State's Attorney's Office, and a criminal investigation into Russell's allegations commenced. Defendant Gagliardi placed Carlone on administrative leave on May 6, 2008, pending the outcome of the investigation. Although

13

Raspardo did not disclose any misconduct toward her when authorities initially questioned her during the Carlone investigation, she eventually reported her complaints soon after Russell came forward with her allegations and made an official statement to the department. Spring made several statements concerning Carlone during the department's investigation, and may have attempted to file an internal complaint concerning the alleged sexual harassment, but she ultimately never did so. None of the plaintiffs filed a formal NBPD complaint utilizing the department's internal reporting procedure.

In June of 2008, Defendant Gagliardi demoted Carlone from sergeant to patrol officer because he found that Carlone had "used [his] supervisory position as Sergeant to engage in an inappropriate, offensive and demeaning pattern of conduct against at least . . . two officers who were working under [his] command." Defs.' App. 68 ¶ 84, 109 ¶ 84. Although criminal charges did not result from the

14

investigation into Russell's allegations, Gagliardi recommended that Carlone be terminated in October of 2008. Carlone retired to avoid termination on January 31, 2009.

*B. The Plaintiffs' Claims Regarding the Other Individual Defendants*

During the period at issue, Gagliardi served as the Chief of Police of the NBPD, Anthony Paventi transitioned from lieutenant to captain, Thomas Steck was a lieutenant, and Kenneth Panetta was a sergeant. The plaintiffs allege that each of these defendants created a hostile work environment and subjected them to disparate treatment on the basis of sex by punishing them more harshly than they punished similarly situated male officers for minor rule infractions. The plaintiffs also allege that the department's investigation into Carlone's inappropriate behavior was delayed and inadequate, and that Gagliardi was grossly negligent in his supervision of his subordinate officers, particularly Carlone.

We discuss below the claims made by the plaintiffs against

15

these four defendants.

1. Motor Vehicle Accidents

The plaintiffs' primary allegations against the remaining defendants focus on their punishment for motor vehicle accidents involving NBPD vehicles. On February 26, 2008, Spring was involved in a motor vehicle accident in which she rear-ended another vehicle. This incident was investigated by Defendant Steck and various non-defendant police officers; a non-defendant officer ultimately concluded that Spring was at fault and issued her a written reprimand. As a result of this accident, the NBPD suspended Spring's motor vehicle privileges until she completed further driver training. Because of her loss of driving privileges, Spring was required to "walk a beat" until she completed the driver training program. Spring had previously sought assignment to the fourth shift, which is from six in the evening until two in the morning, believing that she would be able to drive her patrol car at this time; after her motor vehicle privileges were revoked, however,

16

she was assigned to walk her fourth shift "beat." Spring asserts that she was the only officer to ever walk a beat on the fourth shift and suggests that the defendants discriminated against her on the basis of sex by giving her this assignment. A non-defendant officer explained in his deposition that, although some officers have been assigned to "directed patrols" on the fourth shift during special circumstances (for instance, when special events occur at night that require increased patrolling), Spring was the only officer assigned to the fourth shift without the special circumstances that justify a directed patrol. Spring completed the requisite driver training classes and returned to motor vehicle patrol duties on April 16, 2008.

Raspardo was involved in a serious motor vehicle accident on March 14, 2008, which kept her out of work because of her injuries until May 2, 2008. This accident resulted in severe damage to the vehicles and occupants involved, including $14,000 in damage to her police vehicle and substantial damage to the other vehicle, which

rolled over with a mother and child inside who had to be taken to the hospital for emergency treatment. The NBPD found Raspardo at fault for this accident, a finding Raspardo does not appear to contest in this appeal. Following the advice of her union representative, Raspardo agreed to a four-day work suspension for this accident.[5] As with Spring, Raspardo lost her driving privileges until she completed a driver training program. For reasons that are not clear, Raspardo did not complete the driver training program until October 10, 2008, at which time she returned to normal patrol duties. In the meantime, she walked a beat on the late-night fifth shift. Raspardo, like Spring, asserts that she was the only officer ever forced to walk a beat on this shift.[6] Raspardo also alleges that Defendant Paventi strictly monitored her to ensure that she was not

---

[5] Raspardo asserted below that she only agreed to the suspension because Gagliardi told her that if she did not, she would likely be suspended for thirty days.

[6] A non-defendant officer also testified in his deposition that Raspardo was the only officer required to walk a beat during that shift.

assigned a vehicle during this time, confirmed by Raspardo's direct supervisor at the time, Lieutenant Masternak. She claims that Defendant Steck took a similar interest in ensuring that she was not allowed to operate a vehicle. Finally, Raspardo claims that during the time she was assigned to walk her fifth shift beat, she was forced to patrol on foot during a hurricane.

Finally, Russell describes a car accident in which she and an "Officer Sloate" had a minor collision in their patrol cars. Russell alleges that Carlone assisted Officer Sloate in writing and editing his statement concerning the accident. She also alleges that, although Officer Sloate indicated to her that he easily cleaned up the superficial damage to his vehicle, Russell was "written up" and given a "Supervisor's Warning" for the accident. Russell was also "incidentally" assigned to "walk the beat" at this time. It appears that a "Sergeant Woodruff" investigated this accident and that no defendants other than Carlone were involved.

19

The three plaintiffs allege that male officers who were found at fault for motor vehicle accidents were not disciplined as severely. The comparative accident investigation reports that they presented to the district court mainly involve minor incidents with no injuries and limited property damage, and generally conclude by explaining that a "Supervisor's Warning" was issued or that driver retraining was recommended. Most of the investigating officers who issued these reports are not defendants in this case, and it is not clear from the record whether the recommended punishments were actually enforced. The plaintiffs also allege that it was common knowledge that their NBPD superiors forced them to walk nighttime beats as punishment and that other officers who were involved in similar accidents were not required to walk these late patrols.[7] The plaintiffs admit, however, that at least one male officer ("Officer Jared Barseleau") was required to walk a patrol following car

---

[7] The defendants maintain that all patrols are "walking beats," but an internal NBPD memorandum demonstrates that patrol officers are assigned to use police cruisers 83% of the time.

accidents.

### 2. Sick Leave and Roll Call

Spring and Raspardo also claim that these NBPD superiors treated them more harshly regarding their use of sick time and their tardiness than they treated male officers for committing the same infractions. For example, Spring alleges that Paventi strictly enforced against her a department policy that an officer on sick leave must inform the officer in charge any time the officer leaves her home, and Raspardo and Spring point to several specific instances where the individual defendants reprimanded the plaintiffs for improper use of sick leave and miscommunications about use of sick leave. These plaintiffs also assert that "[t]ardiness without discipline is routine in the police department," but that, despite this, they were publicly reprimanded or "written up" for arriving ten minutes late to their shifts. Defs.' App. 135-36 ¶¶ 104-107, 61 ¶ 59, 107 ¶ 59. They assert that similarly situated male officers were not punished in this manner. They present no evidence aside from their own

statements, however, that specific male officers were treated differently under similar circumstances.

Spring and Russell also claim that Panetta and Steck reprimanded and criticized them for various minor infractions during roll call. For example, Panetta singled out Russell and Spring for not wearing their complete uniforms. The plaintiffs again claim that these defendants did not reprimand male officers for similar infractions, but fail to identify particular instances in which these defendants treated specific male police officers more favorably. For example, Spring alleges that her superiors removed her from the Domestic Violence Reduction Team as punishment for abuse of sick leave and did not place her back on that squad; a male officer was similarly removed from a different squad for the same reason but was eventually reinstated. It is unclear from the record, however, who made these decisions and whether Spring and that male officer are similarly situated.

The plaintiffs also make varied claims about discipline imposed arbitrarily or for spurious reasons. They assert, for instance, that Panetta reprimanded Russell on the radio (when other officers could hear the exchange) and that Steck "wrote up" Raspardo for not wearing her hat five minutes before the end of her shift. They allege that male officers are not disciplined "on the air" and are not "written up" for failing to wear their police hats. Finally, they point to instances during which they were denied "personal days" and incidents during which Paventi identified them as "absent without leave" ("AWOL") after miscommunications about personal days; they assert that male officers were not treated as harshly for similar infractions. Again, they do not provide specific evidence concerning more favorable treatment of male officers. Raspardo also complains of an incident in which her superiors allegedly viewed an injury she suffered while on duty with more skepticism than they viewed a similar injury suffered by

23

Defendant Steck, and an incident in which Defendant Steck ordered Spring to pick up Raspardo and for Raspardo to act as the "initial officer" on all calls, even though officers usually alternate this duty.

3. The Carlone Investigation

The plaintiffs also claim that the department did not timely or adequately respond to "warning signs" regarding Carlone. Although the city's liability is not before us on this appeal, these claims may be relevant to the supervisory liability claim against Gagliardi and provide context for the claims against the other individual defendants.

The Department twice investigated Carlone for alleged inappropriate behavior before the events involving the plaintiffs occurred. First, in 2006, Lieutenant Steck (not Defendant Steck) and Defendant Paventi heard reports that Carlone was "dogging"[8] an "Officer Hayden." This led to an investigation in which Hayden

---

[8] "Dogging" apparently encompassed spending an excessive amount of time focusing on what Officer Hayden was doing and repeatedly going on her calls, calling her on the radio, and asking for her location.

told the department that she did not feel harassed by Carlone. Nonetheless, Carlone's superiors ordered him not to offer rides to Officer Hayden in his patrol car unless it was an emergency.

In the course of this investigation, Lieutenant Steck and Defendant Paventi learned that Carlone had made a joke about a female officer during roll call concerning the use of a vibrator. Although the female officer told the investigating officers that she was not offended by the comment, they referred the incident "up the chain of command," and Gagliardi confronted Carlone about it, ultimately issuing the discipline of "a verbal counseling." Carlone assured Gagliardi that he would not make similar remarks in the future.[9]

The Department investigated Carlone again in December 2006 for misusing the MDT messaging system. This investigation, in which Defendant Paventi participated, determined that Carlone had

---

[9] It appears that Carlone continued to pick Officer Hayden up in his patrol vehicle and that Paventi conducted a verbal counseling session to inform Carlone that he should stop doing this.

used the system to discuss personal matters with female civilian dispatchers and police personnel, and on at least one occasion had sent a message in which offensive language was used. Investigators informed Gagliardi about Carlone's misuse of the MDT messaging system, and Gagliardi suspended Carlone for two days, forced him to forfeit two days of accrued holiday leave, and informed him that any further violation of department rules and regulations may result in more severe discipline.[10] It was during this investigation that the department first learned that Carlone had referred to Spring as "Brown Eye" in an MDT message, but this was not reported to Spring at the time.

### 4. Gagliardi's and Paventi's Comments

The plaintiffs assert that Gagliardi and Paventi also made inappropriate sexual comments to and about them. Raspardo alleges that when she met with Gagliardi before being hired,

---

[10] Lieutenant Steck later stated in a deposition that he believed this punishment was insufficient and may have contributed to future misbehavior by Carlone.

Gagliardi told her that if she was hired "he was going to have a sexual harassment problem with her." Defs.' App. 114 ¶ 16. Paventi, who appears to have been informally responsible for creating nicknames for NBPD officers,[11] referred to Raspardo as "J Lo," a commonly used nickname for the celebrity Jennifer Lopez, which Russell and others understood to be a reference to Raspardo's buttocks. He also called Spring "Tiki," which Spring believed was a sexualized reference to the swinging hips of dashboard tiki dolls. Finally, Paventi referred to Spring, and perhaps other female officers, as "Rock Stars." Spring interpreted this nickname as a reference to a strip club named "Rock Star" in a nearby town. The name's meaning is somewhat unclear, however, because one of Paventi's own nicknames for himself was "Rock Star."[12]

---

[11] Paventi's nicknames for female police officers who are not plaintiffs in this suit included "Shuffler," "Hm," "Boom Boom," "Spider," and "Woo Woo," and he appears to have had nicknames for many of the male NBPD officers as well. Pl. Gagliardi's App. 334-40.

[12] At this stage, we accept the plaintiffs' characterization.

### 5. Gagliardi Denies Light Duty

In 2006, Spring requested to be put on "light duty" following elective eye surgery and a car accident. Gagliardi denied this request. Spring asserts that certain male officers were assigned to "light duty" following injuries. She provides no details or specific evidence concerning these officers.

Russell also appears to allege that Gagliardi denied her request to be put on "light duty" in 2010, pursuant to the Family Medical Leave Act, following her report of Carlone's harassment. She provides no details concerning this incident and does not identify male officers who were treated more favorably.

### 6. Explicit Photos of Spring

In May 2006, a "Sergeant Saccente" reported a rumor that an NBPD officer was showing sexually explicit photographs of a female NBPD officer to emergency medical services ("EMS") employees. The incident was investigated in early 2007, and it was determined that the photographs were of Spring and that the male officer who

28

showed the photographs was her former boyfriend, Officer Stralzka, also an officer in the NBPD. Although Paventi eventually interviewed EMS employees, investigators did not ultimately take any disciplinary action against Stralzka. The plaintiffs allege that the NBPD's response to these allegations was inadequate.

### 7. Use of Videos in Training

At a mandatory training session on April 10, 2008, a "Sergeant Pearson" showed a mixed group of male and female officers, including plaintiffs Russell and Spring, three sexually explicit videos that were irrelevant to the session's subject matter. None of the individual defendants were present at this training session. Supervisors in the department learned of the videos in the fall of 2008, and Defendant Paventi conducted an investigation. Paventi eventually confiscated two of the videos, and it appears that they were not used in future training.

### 8. Paventi's Investigation of Allegations of Russell's Poor Performance

Russell alleges that Paventi investigated alleged poor performance by her and other police officers who responded to two particular police calls and unfairly discredited her version of events in retaliation for reporting Carlone's sexual misconduct. She asserts that in these instances, Paventi credited the accounts of the male officers involved rather than accepting Russell's explanation. It is unclear from the record whether these allegations were formalized in a performance evaluation or resulted in disciplinary action because the allegation is made in a conclusory fashion and no other materials are submitted to substantiate it.

### 9. Paventi's Calls to Spring's New Employer

Spring alleges, with no evidentiary support in the record, that after she left the NBPD in 2008 to join the Torrington Police Department, Paventi called her new supervisor in Torrington. She asserts that Paventi informed him that Spring had called out sick

from her duties at the NBPD in order to attend the Torrington Police Department swearing-in ceremony, that she abused sick time, and to "watch out" for her because she was suing the NBPD for sexual harassment. Spring does not allege that this phone call affected her employment at the Torrington Police Department.

10. Paventi's Allegation that Raspardo Deleted a Report

Raspardo alleges that in February of 2010, almost two years after she reported her allegations of sexual harassment, Paventi informed Defendant Steck that Raspardo purposely deleted a police report she had completed, lied about deleting the report, and then "undeleted" the report. Raspardo's assertion regarding Paventi's role in this incident, however, appears to be based on speculation; the incident is not substantiated in the record, and no further details are given about it.[13]

---

[13] Although Raspardo makes this claim on appeal, it was not included in her Rule 56.1 statement below. We thus do not address it further.

### 11. Raspardo's Knowledge of Spanish

On May 2, 2010, approximately two years after Raspardo made her initial complaints concerning sexual harassment, Defendant Panetta submitted a report to his superiors stating that he had observed Raspardo, who previously represented that she did not speak Spanish, speaking Spanish while on a call.[14] He wrote in this report that "there is reason to believe that she has been insubordinate in lying directly to her supervisor about her ability to utilize the Spanish language at work." Pl. Gagliardi's App. 342. Panetta requested to review Raspardo's departmental background investigation in order to determine if Raspardo had any proficiency in Spanish. This led to an investigation in which Gagliardi and Paventi were involved. Raspardo does not appear to have been disciplined for the incident, but she filed a NBPD administrative complaint of harassment against Panetta and submitted a letter to

---

[14] Apparently, it would have been an advantage to the NBPD to utilize officers who spoke Spanish in certain situations.

Gagliardi, alleging that Gagliardi pursued the investigation into her Spanish-speaking abilities in order to punish her for filing her sexual harassment suit against the Department. The plaintiffs do not provide further details regarding the incident.

**II.    Procedural History**

After exhausting state administrative proceedings that apply only to their Title VII claims,[15] the plaintiffs filed suit in the United States District Court for the District of Connecticut against the City of New Britain, the NBPD, the police union, and the five individual defendants. The plaintiffs asserted claims against the city and its police department under Title VII, 42 U.S.C. § 1983, and Connecticut law.[16] The plaintiffs asserted claims under 42 U.S.C. § 1983 and

---

[15] The plaintiffs initiated proceedings before the CHRO in September of 2008. Like the Equal Employment Opportunity Commission, the CHRO is an avenue for exhaustion of remedies in Connecticut, and the CHRO is authorized to issue "right to sue" letters. Because the claims in this appeal concern 42 U.S.C. § 1983, administrative exhaustion is not required. *Annis v. Cnty. of Westchester*, 36 F.3d 251, 254-55 (2d Cir. 1994).

[16] The plaintiffs failed to assert claims against the police union in their revised amended complaint, thus removing it as a defendant.

Connecticut law against the five individual defendants.

Carlone and the other individual defendants separately moved for summary judgment as to the § 1983 claims, asserting the defense of qualified immunity and arguing that the plaintiffs failed to adduce evidence establishing a hostile work environment or disparate treatment. As mentioned above, Carlone did not move for summary judgment as to Russell's hostile work environment claims under § 1983 against him.

In an order dated March 29, 2012, the district court (Alvin W. Thompson, *J.*) addressed Carlone's motion for summary judgment. The district court concluded as to Raspardo's and Spring's 42 U.S.C. § 1983 claims that genuine issues of material fact existed precluding summary judgment on the basis of qualified immunity. The district court did not identify these issues of material fact. The district court did, however, grant summary judgment to Carlone on Russell's, Raspardo's, and Spring's state law claims on the basis that these

34

claims had been withdrawn.

The district court also denied in a separate order the remaining individual defendants' motion for summary judgment as to qualified immunity. The district court concluded that genuine issues of material fact existed, but did not identify the factual issues which precluded a grant of qualified immunity. The district court also granted summary judgment to these defendants on the plaintiffs' state law claims because the state statutes at issue did not provide causes of action against these defendants.[17]

Carlone appealed from the district court's denial of his motion for summary judgment, arguing that he was entitled to qualified immunity from Raspardo's and Spring's hostile work environment claims. The remaining individual defendants filed a similar appeal, claiming qualified immunity on the plaintiffs' § 1983 hostile work

---

[17] The City of New Britain and the NBPD also moved for summary judgment on the claims against them. That motion was granted as to certain state law claims but denied as to the federal claims, including those brought under Title VII. That ruling is not before us on this appeal.

35

environment, retaliation, and disparate treatment claims.[18] The plaintiffs' remaining claims, such as their Title VII claims against the City of New Britain, remain pending in the district court.

**DISCUSSION**

The issue in this appeal is whether the five individual defendants are entitled to qualified immunity from the plaintiffs' hostile work environment and disparate treatment claims under 42 U.S.C. § 1983.

We review *de novo* a district court's denial of a public official's motion for summary judgment on the basis of qualified immunity. *Poe v. Leonard*, 282 F.3d 123, 131 (2d Cir. 2002). In evaluating a motion for summary judgment, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam). Because

---

[18] Although the defendants challenged the district court's ruling as to the plaintiffs' retaliation claims in their appeal, the plaintiffs failed to present any substantive argument on retaliation in their briefs. Thus, we consider these claims abandoned.

this appeal is before us following the denial of the defendants' motions for summary judgment, the facts considered below are either undisputed or resolved in favor of the plaintiffs. *See id*.

**I.    Qualified Immunity**

*A. Appellate Jurisdiction*

The doctrine of qualified immunity "protects federal and state officials from . . . unnecessary and burdensome discovery or trial proceedings." *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012) (internal quotation marks omitted). Qualified immunity "is both important and completely separate from the merits of the action, and this question c[annot] be effectively reviewed on appeal from a final judgment because by that time the immunity from standing trial will have been irretrievably lost." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2019 (2014). Thus, although denials of motions for summary judgment are generally not appealable, a district court's denial of a defendant's motion for summary judgment on the ground of qualified immunity is immediately appealable under the collateral

order doctrine if the district court's denial of that motion turned on a legal question. *Id.* at 2018-19; *see also Demoret v. Zegarelli*, 451 F.3d 140, 148 (2d Cir. 2006); *Poe*, 282 F.3d at 131. For example, when a district court rejects a defendant's assertion of qualified immunity on a motion for summary judgment because it concludes that the law the defendant allegedly violated was "clearly established," that order may be appealed immediately. *See Salim v. Proulx*, 93 F.3d 86, 89 (2d Cir. 1996); *cf. Johnson v. Jones*, 515 U.S. 304, 313-18 (1995) ("*Jones*") (holding that there is no appellate jurisdiction over a district court's denial of a defendant's motion for summary judgment where the defendant challenges whether the plaintiffs have set forth sufficient evidence to create genuine issues of material fact).

When a district court denies a defendant's motion for summary judgment because it finds that genuine factual disputes preclude granting the defendant qualified immunity, immediate

38

appellate review may also be available.  *See Behrens v. Pelletier*, 516 U.S. 299, 312-13 (1996) (clarifying that, even where a district court denies a defendant's motion for summary judgment on the ground that material issues of fact exist precluding a grant of summary judgment, such a decision is appealable when the appellate court "resolve[s] a dispute concerning an 'abstract issu[e] of law' relating to qualified immunity"); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007); *Terebesi v. Torreso*, Nos. 12-3867, 12-3868, 12-3870, 12-3898, 12-3903, 12-3990, 2014 WL 4099309, at *7 (2d Cir. Aug. 21, 2014).

We have held that "a district court's mere assertion that disputed factual issues exist[] [is not] enough to preclude an immediate appeal."  *Salim*, 93 F.3d at 89.  Immediate appeal is available from fact-related rulings "as long as the defendant can support an immunity defense on stipulated facts, facts accepted for purposes of the appeal, or the plaintiff's version of the facts that the district judge deemed available for jury resolution."  *Id.* at 90; *see also*

39

*Terebesi*, 2014 WL 4099309, at *7; *Poe*, 282 F.3d at 132; *Jemmott v. Coughlin*, 85 F.3d 61, 65-66 (2d Cir. 1996).

The individual defendants here contend that, even when all disputed factual issues are resolved in favor of the plaintiffs, they are entitled to qualified immunity. We thus need not resolve any disputed facts or weigh the sufficiency of the evidence as prohibited by *Jones*, 515 U.S. at 319-20, to determine if the plaintiffs suffered actionable sexual harassment or disparate treatment. Whether the defendants' conduct, as examined by viewing the evidence presented at summary judgment in a light favorable to the plaintiffs, violated the plaintiffs' Fourteenth Amendment rights to equal protection (through sexual harassment or disparate treatment) is a question of law. We therefore have appellate jurisdiction to determine whether the defendants violated the plaintiffs' constitutional rights based on the plaintiffs' version of the facts. *See Jemmott* 85 F.3d at 65-67 (finding appellate jurisdiction over district

court's denial of defendants' motion for summary judgment in plaintiff's Title VII and 42 U.S.C. § 1983 hostile work environment and grossly negligent supervision claims); *Poe*, 282 F.3d at 132 ("Despite the District Court's assertion that a genuine dispute exists as to whether a reasonable supervisor would have supervised [the offending party] differently, this dispute is essentially a legal one."). Although this analysis requires us to perform a "detailed evidence-based review of the record," *Jones*, 515 U.S. at 319, the Supreme Court in *Jones* explicitly recognized that such an examination is especially important for the purposes of resolving qualified immunity at an early stage in the proceedings where the district court has denied a defendant's motion for summary judgment on the ground of qualified immunity without explanation. *Id.*

*B. The Standard for Qualified Immunity*

In deciding "questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry." *Tolan*, 134 S. Ct. at 1865. The first prong "asks whether the facts, taken in the

light most favorable to the party asserting the injury . . . show the officer's conduct violated a federal right[,] . . . [and] [t]he second prong of the qualified-immunity analysis asks whether the right in question was clearly established at the time of the violation." *Id.* at 1865-66 (internal citations, alterations, and quotation marks omitted). Officials operating under color of state law[19] are thus entitled to summary judgment when they can establish that either "(1) a constitutional right was [not] violated or (2) the right was not clearly established [at the time of the violation]." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of City of N.Y.*, 746 F.3d 538, 543 (2d Cir. 2014) (internal citation and quotation marks omitted); *see also Coollick*, 699 F.3d at 219. As to the first question, if the evidence construed in the light most favorable to the plaintiffs fails to establish as a matter of law that the defendant violated the plaintiff's constitutional rights, qualified immunity is warranted.

---

[19] It is undisputed that the individual defendants here were at all times operating under color of state law.

42

*Saucier v. Katz*, 533 U.S. 194, 201 (2001), *abrogated in part on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009). If, however, the evidence does demonstrate a violation of the plaintiff's constitutional rights, the second question is whether that constitutional right was "clearly established" at the time the official engaged in the conduct. *Saucier*, 533 U.S. at 201. Answering this second inquiry requires determining whether a reasonable official would understand that his conduct violated the constitutional right in question. *Id.* at 202 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). A court may consider these two questions in either order, and if it determines that one prong is not satisfied, it need not reach the other. *See Pearson*, 555 U.S. at 236; *see also Coollick*, 699 F.3d at 219-20.

*C. Individual Liability in § 1983 Hostile Work Environment Claims*

The first prong of qualified immunity analysis requires us to determine whether a reasonable jury could conclude that the evidence presented by the plaintiffs establishes that each individual

43

defendant violated their constitutional right to be free from a hostile work environment and disparate treatment on the basis of sex. That task, in turn, requires us to determine the liability of individual defendants under 42 U.S.C. § 1983, which entails an examination of the intersection between Title VII sex discrimination jurisprudence and § 1983's requirement of individual liability.

### 1. Liability for Non-Supervisory Conduct

Although plaintiffs frequently bring hostile work environment claims against their employers under Title VII, 42 U.S.C. § 2000e-5(e), which does not create liability in individual supervisors and co-workers who are not the plaintiffs' actual employers, *Spiegel v. Schulmann*, 604 F.3d 72, 79 (2d Cir. 2010), state and local officials can be held individually liable under 42 U.S.C. § 1983 for violating the Equal Protection Clause of the Fourteenth Amendment by discriminatory acts against those who work under them. Public employees have "a clear right, protected by the Fourteenth Amendment, to be free from discrimination on the basis

44

of sex in public employment." *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 117 (2d Cir. 2004). We have held that the Equal Protection Clause protects such employees from sex-based workplace discrimination, including hostile work environments and disparate treatment. *See Demoret*, 451 F.3d at 149; *Patterson v. County of Oneida*, 375 F.3d 206, 226 (2004); *Jemmott*, 85 F.3d at 67-68.

To establish a hostile work environment claim under the Title VII framework, a plaintiff must show that the "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations and quotation marks omitted). This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work

45

environment to be abusive. *Id.* at 21-22; *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002). The incidents complained of "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Alfano*, 294 F.3d at 374 (internal quotation marks omitted). There is no "mathematically precise test," however, for deciding whether an incident or series of incidents is sufficiently severe or pervasive to alter the conditions of a plaintiff's working environment. *Harris*, 510 U.S. at 22-23. Instead, courts must assess the totality of the circumstances, considering elements such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. The effect of identified incidents on the employee's psychological well-being is also relevant, though not determinative. *Id.*

Although we have long recognized that Title VII-based hostile

work environment claims by government employees are actionable under § 1983, *see Patterson*, 375 F.3d at 225-27, we have not specified in our prior decisions the role of individual responsibility required for a defendant in a § 1983 case involving claims of sex-based harassment by multiple defendants, nor have we charted supervisory liability in this context.

This case demonstrates how hostile work environment claims that may readily be brought against employers under Title VII do not always fit easily within the context of individual liability under § 1983. The Title VII framework often requires courts to consider the workplace conduct of multiple employees and supervisors in determining whether the plaintiff has experienced a hostile work environment. *See, e.g.*, *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 77 (1998) (describing the harassing actions taken by employees both jointly and individually which could contribute to a hostile work environment in a Title VII case). Hostile work

47

environment claims under Title VII thus look to the circumstances of the plaintiff's employment, and hold the *employer* liable when the misconduct in the workplace is so severe as to alter the terms and conditions of the plaintiff's employment. *See Harris*, 510 U.S. at 21.

Section 1983, however, applies by its terms only to individual "persons" responsible for violating plaintiffs' rights.[20] In order to overcome a government official's claim to qualified immunity and "establish individual liability under § 1983, a plaintiff must show . . . that the defendant caused the plaintiff to be deprived of a federal right." *Back*, 365 F.3d at 122; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). If a defendant has not *personally* violated a plaintiff's constitutional rights, the plaintiff cannot succeed on a § 1983 action against the defendant.

Our few prior decisions addressing multi-defendant § 1983

[20] 42 U.S.C. § 1983 (imposing liability only on "person[s]" who violate plaintiffs' constitutional rights). *Monell v. Department of Social Services* defines municipalities as "persons" under § 1983. 436 U.S. 658, 690 (1978); *see also Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 42 (2d Cir. 2014). The plaintiffs' *Monell* claim is not at issue in this appeal.

hostile work environment cases have denied qualified immunity to defendants whose conduct, considered alone, was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment. For example, in *Patterson v. County of Oneida*, we upheld qualified immunity for defendants who had not participated in the acts of harassment of which the plaintiff complained, but remanded for trial in the case of defendants whose separate discriminatory acts could be found by a jury to be "sufficiently humiliating to alter the conditions of [the plaintiff's] employment." 375 F.3d at 229-30. Similarly, in *Jemmott v. Coughlin*, we recognized that "[e]ach individual defendant's alleged conduct towards [the plaintiff], if proven, did [separately] amount to 'severe and pervasive' harassment, which therefore violated [the plaintiff's] clearly established rights," precluding a grant of qualified immunity. 85 F.3d at 67.

Thus, our prior cases have established only that when a

plaintiff alleges that multiple individual defendants have engaged in uncoordinated and unplanned acts of harassment, each defendant is only liable under § 1983 when his own actions are independently sufficient to create a hostile work environment. We therefore cannot say that it is clearly established law that an individual defendant has violated a plaintiff's equal protection rights if he has not personally behaved in such a way as to create an atmosphere of severe or pervasive harassment. Accordingly, absent such behavior, an individual defendant is entitled to qualified immunity.[21] *See also Grillo v. N.Y.C. Transit Auth.*, 291 F.3d 231, 234 (2d Cir. 2002) ("In order to survive a motion for summary judgment on his . . . equal

---

[21] Jointly planned or perpetrated acts of harassment, of course, may be attributed to each of the defendants. *See, e.g.*, *Dwares v. City of New York*, 985 F.2d 94, 99 (2d Cir. 1993) (permitting a § 1983 suit to proceed against defendant-police officers where plaintiffs alleged that the officers conspired with attackers who injured plaintiffs), *abrogated on other grounds by Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 167-68 (1993). As plaintiffs have not argued that the defendants acted in concert, we have no occasion here to consider the extent of the evidence required to establish such joint action. We caution, however, that conspiracies may exist even if their members have not expressly agreed to engage in joint behavior, and may be inferred from the actions of multiple parties who are aware of, and intentionally commit acts to further, a common project.

protection . . . claims, [the plaintiff] must come forward with at least some credible evidence that the actions of the *individual appellees* were motivated by racial animus or ill-will." (emphasis added)). *But cf. Reynolds v. Barrett*, 685 F.3d 193, 204-06 (2d Cir. 2012) (holding that, because liability under § 1983 requires personal involvement by a defendant, the "pattern-or-practice framework," which demonstrates that a pattern of discrimination exists in the aggregate at a corporate entity, is "ill-suited to the task of identifying which individual defendants engaged in purposeful discrimination" and cannot be imported into the § 1983 context).[22]

## 2. Supervisory Liability

Individual liability under § 1983 in hostile work environment claims may also involve supervisory liability. In addressing the "federal analog" of § 1983 *Bivens* actions, the United States Supreme Court in *Ashcroft v. Iqbal* confirmed that liability for supervisory

---

[22] We note that the plaintiffs sue the individual defendants in their individual capacities only.

51

government officials cannot be premised on a theory of *respondeat superior* because § 1983 requires individual, personalized liability on the part of each government defendant. 556 U.S. 662 (2009). Instead, "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 676. Thus, "each Government official . . . is only liable for his or her own misconduct." *Id.* at 677; *see also Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 753 (2d. Cir. 2003) ("It is well settled . . . that the doctrine of respondeat superior standing alone does not suffice to impose liability for damages under section 1983 on a defendant acting in a supervisory capacity."). Prior to *Iqbal*, we held that:

> The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which

52

unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [plaintiffs] by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *see also Back*, 365 F.3d at 127; *Hayut*, 352 F.3d at 753. In addition to satisfying one of these requirements, a plaintiff must also establish that the supervisor's actions were the proximate cause of the plaintiff's constitutional deprivation. *Poe*, 282 F.3d at 134. Finally, as with individual liability, in the § 1983 context, a plaintiff must establish that a supervisor's behavior constituted intentional discrimination on the basis of a protected characteristic such as sex. *Patterson*, 375 F.3d at 226.

As relevant here, "gross negligence" denotes a higher degree of culpability than mere negligence. *Poe*, 282 F.3d at 140 n.14, 146. It is "the kind of conduct where the defendant has reason to know of

53

facts creating a high degree of risk of . . . harm to another and deliberately acts or fails to act in conscious disregard or indifference to that risk." *Id.* (internal citations, alterations, and quotation marks omitted). A supervisor is protected by qualified immunity so long as reasonable officials could disagree about whether the supervisor's action was grossly negligent in light of clearly established law. *See id.* at 146 ("[T]he legal inquiry necessitated by the defense of qualified immunity . . . requires that a court determine whether, under the plaintiff's version of the facts, reasonable officers in the defendant's position could disagree as to the legality of his actions.").

The standard of gross negligence is satisfied where the plaintiff establishes that the defendant-supervisor was aware of a subordinate's prior substantial misconduct but failed to take appropriate action to prevent future similar misconduct before the plaintiff was eventually injured. *See, e.g., Johnson v. Newburgh*

*Enlarged Sch. Dist.*, 239 F.3d 246, 255 (2d Cir. 2001) ("*Johnson*") (holding that, where complaint alleged defendant-supervisors were aware teacher assaulted students on four occasions prior to his assault of the plaintiff, "a jury could find the [s]upervisors personally involved in the unconstitutional deprivation on the basis that they were . . . grossly negligent in supervising" the teacher); *Meriwether v. Coughlin*, 879 F.2d 1037, 1047-48 (2d Cir. 1989) (affirming finding of supervisory liability when evidence showed that supervisors knew or should have known that plaintiff-inmates' reputations as alleged planners of a violent insurrection would expose them to extreme hostility from the guards, yet took no precautions for the inmates' safety); *see also Poe*, 282 F.3d at 146 (holding that the plaintiff failed to raise a triable issue regarding the defendant-supervisor's alleged gross negligence where the supervisor failed to review his subordinate's personnel history and was aware of inappropriate, though not sexually provocative,

demands the employee had made to other women).

A supervisor is not grossly negligent, however, where the plaintiff fails to demonstrate that the supervisor knew or should have known of a problematic pattern of employee actions or where the supervisor took adequate remedial steps immediately upon learning of the challenged conduct. *See, e.g.*, *Hayut*, 352 F.3d at 753; *Colon*, 58 F.3d at 873. A plaintiff pursuing a theory of gross negligence must prove that a supervisor's neglect caused his subordinate to violate the plaintiff's rights in order to succeed on her claim. *Poe*, 282 F.3d at 140.

We have not yet determined the contours of the supervisory liability test, including the gross negligence prong, after *Iqbal.* 556 U.S. at 676-77; *see Reynolds*, 685 F.3d at 205-06 n.14 (casting doubt on the continuing vitality of each prong of the supervisory liability test). We need not decide this question here because, as explained below, Gagliardi did not act with gross negligence in his supervision

56

of Carlone, and the other tests for supervisory liability are not satisfied.

### D. Raspardo's and Spring's Hostile Work Environment Claims Against Carlone

We conclude that the first prong of the test for qualified immunity with relation to Defendant Carlone is satisfied as to Spring. Carlone did not create a hostile work environment for Spring and therefore did not violate her constitutional right to equal protection. In light of this conclusion, we need not reach the second question of whether a reasonable officer would have understood Carlone's conduct as sufficient to constitute a hostile work environment. Thus, we conclude that Carlone is entitled to qualified immunity on Spring's § 1983 hostile work environment claim and reverse the decision of the district court.

Raspardo's hostile work environment claim is more substantial. Ultimately, the four principal incidents of Carlone's behavior alleged by Raspardo, including unwanted physical contact

and comments of a sexual nature in front of other officers, when combined with the "over ten occasions" on which Carlone allegedly made comments about Raspardo's body during the same one-year period, are sufficient to permit a jury to find a hostile work environment. We also conclude that Carlone's conduct was clearly established as unlawful sexual harassment at the time of the events in question and that objectively reasonable officers would not disagree that Carlone's conduct constituted sexual harassment. Carlone has thus failed to establish qualified immunity as to Raspardo. We therefore affirm the district court's denial of qualified immunity to Carlone on Raspardo's hostile work environment claim.

1. Spring's Claims

Spring's claims against Carlone rest primarily on two incidents. The first is the 2007 police call concerning a naked woman. As mentioned, Carlone sent Spring a message saying she would "be perfect" for the call and then sent additional messages

58

that Spring found offensive. Spring did not respond directly to the messages and had no issues with Carlone at the scene. Second, throughout her time under Carlone's supervision, Carlone gave Spring rides in his police cruiser while she was walking a patrol. On these occasions, Carlone would sometimes ask Spring about her dating history, which she found uncomfortable, but she did not otherwise perceive Carlone's actions to be inappropriate. Spring subsequently learned that Carlone had been instructed not to pick up female officers in his cruiser, but she did not regard these interactions as inappropriate at the time. Finally, Carlone referred to Spring as "Brown Eyes" on a number of occasions.

This conduct falls short of the standard required for a hostile work environment claim. While Carlone's comments in the MDT message may have been offensive, they appear to have been isolated and were not as substantial as events that we have found sufficient to create a hostile work environment in prior decisions. *Compare*

59

*Alfano*, 294 F.3d at 374 (noting that, as a general rule, "episodic" incidents will not be sufficient to establish a hostile work environment), *with Howley v. Town of Stratford*, 217 F.3d 141, 149, 154 (2d Cir. 2000) (finding that a single incident created a hostile work environment when the plaintiff's co-worker went on a lengthy, vulgar tirade against the plaintiff in the presence of a large group of co-workers). Spring did not regard Carlone giving her rides in his cruiser as inappropriate at the time. As a matter of law, these incidents, as well as the use of the nickname, spread over more than a year, were not "sufficiently severe or pervasive to alter the conditions of [Spring's] employment and create an abusive working environment." *Alfano*, 294 F.3d at 373 (internal quotation marks omitted).

Spring supports her claim by also pointing to various comments Carlone made to others about her body or dating life outside of Spring's presence. However, Spring admits that she did

not learn of any of these comments until after Carlone had been placed on administrative leave and Spring had resigned from the NBPD. Had Spring learned of these comments while she was employed at the NBPD and while Carlone was still her supervisor, perhaps they would have supported Spring's hostile work environment claim against Carlone.

That Spring never learned of these remarks while employed by the NBPD makes her situation unlike others involving comments made outside the plaintiff's presence. *See Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) ("[T]he fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor . . . can impact the work environment."); *Torres v. Pisano*, 116 F.3d 625, 633 (2d Cir. 1997) ("The fact that many of [the plaintiff's supervisor's] statements were not made in [the plaintiff's] presence is, in this case, of no matter; an employee who knows that her boss is saying things of this sort behind her back may

61

reasonably find her working environment hostile.").

Construing the incidents cited by Spring generously in her favor, we hold as a matter of law that Carlone's behavior did not create a sufficiently abusive working environment for Spring. Thus, Carlone is entitled to qualified immunity as to her hostile work environment claim.

2. Raspardo's Claims

Raspardo cites four principal incidents to support her hostile work environment claim against Carlone. In 2007, Carlone asked Raspardo if she was "planning to go out drinking or have sex with [her] boyfriend," another officer in the department, told Raspardo that her uniform should be more "form fitting," and attempted to massage Raspardo's shoulders. In early 2008, Carlone showed Raspardo a suggestive photograph of a woman wearing tactical gear in a magazine which was focused on the woman's buttocks and passed the photo around to other male officers who were also present, saying that the woman's buttocks looked like Raspardo's.

Raspardo told Carlone that his comments were not funny or ignored him and left immediately during these incidents.

Raspardo also stated in a sworn statement to the NBPD during its investigation of Carlone that Carlone, her direct supervisor at the time, "made references [of a sexual nature] to [her] body parts on at least over ten occasions," particularly concerning her buttocks, often in front of other officers, which made her "feel disrespected, angry, and embarrassed." Pl. Carlone's App. 4-5. She reiterated these allegations in her later deposition testimony and interrogatory answers.

The four principal incidents, including unwanted touching and vulgar comments in front of other officers, when combined with the "over ten" additional comments about Raspardo's body, all over a period of just one year, would be amply sufficient to permit a jury to find a sexually hostile work environment. *See Raniola v. Bratton*, 243 F.3d 610, 618-20 (2d Cir. 2001) (observing that numerous

63

incidents of vulgar name calling and workplace sabotage could create a hostile work environment); *Carrero v. N.Y.C. Housing Auth.*, 890 F.2d 569, 578 (2d Cir. 1989) (holding a supervisor's constant unwelcome attempts to touch and kiss the plaintiff sufficient to establish a hostile work environment). The evidence presented by Raspardo, if true, demonstrates that Carlone violated her constitutional right to equal protection through this sexual harassment.

Raspardo's right to be free from severe or pervasive sexual harassment was also clearly established at the time of Carlone's conduct in 2007 and 2008. This Court has repeatedly held that public employees have the right to be free from discrimination based on their sex, and we have made Title VII hostile work environment claims available under § 1983. *See Demoret*, 451 F.3d at 149; *Patterson*, 375 F.3d at 226; *Back*, 365 F.3d at 117; *Jemmott*, 85 F.3d at 66-67. We also cannot accept Carlone's contention that an objectively

64

reasonable police officer would believe that this conduct was not clearly sexual harassment. *See Jemmott*, 85 F.3d at 67; *see also Royal Crown Day Care LLC*, 746 F.3d at 545. Carlone has failed to establish either that he did not violate Raspardo's constitutional right to equal protection or that the right was not clearly established at the time of his conduct; he is thus not entitled to qualified immunity. We therefore affirm the district court's denial of Carlone's motion for summary judgment on the basis of qualified immunity as to Raspardo's hostile work environment claim.

E. *The Hostile Work Environment Claims of Russell, Raspardo, and Spring Against the Remaining Defendants*

Carlone's conduct was clearly sex-based. By contrast, the plaintiffs' evidence against the remaining four individual defendants presents conduct that, with few exceptions, does not appear to be tied to the plaintiffs' sex. Thus, in addition to considering whether the acts of a particular defendant were sufficient to create a hostile work environment for a particular

plaintiff, we must consider whether the plaintiffs have alleged and presented evidence from which a reasonable jury could conclude that the conduct was caused by intentional discrimination based on sex. *See Patterson*, 375 F.3d at 226 ("[A]lthough in certain circumstances a Title VII claim may be established through proof of a defendant's mere negligence, without a showing of discriminatory intent, a plaintiff pursuing a . . . denial of equal protection under § 1983 must show that the discrimination [based on a protected characteristic] was intentional." (internal citation omitted)); *Back*, 365 F.3d at 118 ("To make out . . . a claim [for sex discrimination in violation of the Fourteenth Amendment under § 1983], the plaintiff must prove that she suffered purposeful or intentional discrimination on the basis of gender.").

We must also apply supervisory liability analysis to Gagliardi, who was the Chief of the NBPD at the time of the plaintiffs' alleged harassment, to determine whether he violated the plaintiffs'

constitutional rights on that basis.[23] *See Hayut*, 352 F.3d at 753; *Colon*, 58 F.3d at 873; *see also Iqbal*, 556 U.S. at 676.

For the reasons that follow, we conclude that the remaining individual defendants, including Gagliardi, are entitled to qualified immunity on all of the plaintiffs' hostile work environment claims. Because the first prong of the qualified immunity test is satisfied with respect to these defendants, we need not reach the question of whether reasonable officers would have perceived each individual defendant's conduct as objectively sufficient to create a hostile work environment for the plaintiffs.

### 1. Claims Against Steck and Panetta

The plaintiffs' evidence against defendants Steck and Panetta

---

[23] The other defendants are also supervisors, but the plaintiffs have not clearly asserted supervisory-based claims as to them. Although the plaintiffs suggest in their brief that Defendant Paventi was grossly negligent in his supervision of Carlone, both their briefs and the record focus on Gagliardi's supervisory negligence as Chief of Police and provide minimal substantive arguments, few allegations, and little evidence concerning Paventi's supervision of Carlone; we thus only perform the applicable supervisory liability analysis with relation to Gagliardi.

requires only brief discussion. The plaintiffs assert that each of these two defendants reprimanded them for tardiness, not properly maintaining their uniforms, and miscommunications over their use of sick leave and personal days. Raspardo also alleges that Panetta initiated an investigation into whether she lied to the NBPD about her inability to speak Spanish after he heard her speak Spanish to a child while on a call,[24] and Russell alleges that Panetta reprimanded her over the radio when other officers could hear the exchange. The plaintiffs claim generally, without providing much detail, that Steck and Panetta did not act similarly toward male officers who committed the same offenses.

We cannot conclude that the defendants' conduct was motivated by the plaintiffs' sex. We have previously recognized that plaintiffs may present circumstantial proof that "adverse treatment that was not explicitly sex-based was, nevertheless, suffered on

---

[24] Raspardo does not deny that she spoke in Spanish to the child. Rather, she asserts that she only spoke a few basic words—the limit of her knowledge.

account of sex." *Raniola*, 243 F.3d at 621-22; *see also Moll v. Telesector Res. Grp., Inc.*, Nos. 12-4688-cv, 13-0918-cv, 2014 WL 3673357, at *4 (2d Cir. July 24, 2014) (holding, in the Title VII context, that the district court erred in failing to consider sex-neutral conduct in light of facially sex-based conduct); *Alfano*, 294 F.3d at 377 (holding, in the Title VII context, that "to the extent that the plaintiff relies on facially neutral incidents to create the quantum of proof necessary . . . she must have established a basis [at trial] from which a reasonable fact-finder could infer that those incidents were infected by discriminatory animus").

Here, however, the only evidence the plaintiffs offer to connect Steck's and Panetta's reprimands to the plaintiffs' sex is the plaintiffs' own affidavits, which provide one-sentence descriptions of occasions on which male officers (often not identified by name) allegedly committed similar infractions without a reprimand. Even construing this evidence generously in favor of the plaintiffs, their

69

comparisons fail to establish that Steck and Panetta singled out the plaintiffs for adverse treatment based on their sex. *See Scott*, 550 U.S. at 380. Steck and Panetta did not individually violate the plaintiffs' constitutional rights by creating a hostile work environment. Therefore, they are entitled to qualified immunity on the plaintiffs' hostile work environment claims.

### 2. Claims Against Paventi

Defendant Paventi presents a closer case. Unlike Steck and Panetta, the plaintiffs present evidence that Paventi engaged in some conduct that was facially sex-based. He used the nickname "J Lo" for Raspardo, which Russell and others took as a reference to the celebrity Jennifer Lopez and Raspardo's buttocks, and he called Spring "Tiki," which Spring and other unidentified members of the department believed was a sexualized reference to the swinging hips of dashboard tiki dolls. Paventi also referred to Spring and other female officers as "Rock Stars" or "Rock Star," which Spring interpreted as a reference to a strip club named "Rock Star" in a

70

nearby town. While the meaning of these nicknames is subject to dispute, for purposes of this appeal we must accept the plaintiffs' interpretation. *See Jemmott*, 85 F.3d at 66. Paventi's use of these nicknames means it would be possible to conclude that his actions were based on the plaintiffs' sex. *See Raniola*, 243 F.3d at 621-23.

Nonetheless, Paventi is entitled to qualified immunity because Paventi's behavior toward the plaintiffs was not sufficiently severe or pervasive to violate clearly established law. Spring and Russell have presented few specific allegations and minimal facts concerning actions taken by Paventi against them, and the few instances they have cited, such as reprimanding Spring for misusing sick leave, crediting other officers' complaints of Russell's poor performance, and identifying them as "absent without leave" after miscommunications about personal days, are insufficient as a matter of law to establish a hostile work environment. *See Demoret*, 451 F.3d at 150 (holding that a supervisor's close monitoring of

71

plaintiff's work, mild rudeness to her, failure to take advantage of all of her abilities, and reassignment of some of plaintiff's responsibilities to other employees was not so severe as to be abusive).

The plaintiffs make several other unrelated claims against Paventi, including failing to timely investigate a complaint that an NBPD officer was showing sexually explicit photographs of Officer Spring to EMS employees, being aware of inappropriate videos used during training but failing to take timely action, being involved in an investigation of whether Raspardo spoke Spanish, and making negative comments about Spring to her new employer. These isolated incidents, even when construed generously in the plaintiffs' favor, are insufficient as a matter of law to create a hostile work environment.

Raspardo and Spring claim that Paventi took a disproportionate interest in ensuring that they not operate police

vehicles while their driving privileges were suspended following car accidents for which non-defendant officers found them at fault and assigned them to driver retraining.[25]  We see no basis upon which to conclude that these actions by Paventi created a hostile work environment.  *See Demoret*, 451 F.3d at 150 (holding that a supervisor's close monitoring of plaintiff's work "was not so severe as to be abusive").  Paventi was merely enforcing disciplinary orders that plaintiffs concede were justified.  Therefore, even in light of this evidence, Paventi is entitled to qualified immunity on their hostile work environment claims.

3.  Claims Against Gagliardi

The plaintiffs' claims against then-Chief of the NBPD, Gagliardi, raise somewhat different issues.  They bring claims against Gagliardi alleging that his individual actions created a

---

[25] Spring and Raspardo both lost driving privileges following automobile accidents in which they were found to be at fault, but neither has presented evidence that Paventi was involved in the evaluation of their fault in the accidents or their loss of driving privileges.

73

hostile work environment, and they also claim that he failed to properly supervise or investigate the conduct of subordinate police officers who allegedly sexually harassed them, particularly Carlone.

As described above, a supervisor cannot be held liable under a theory of *respondeat superior* for the constitutional torts of his subordinates; he must be personally involved in a constitutional violation in order to generate liability under § 1983. *Iqbal*, 556 U.S. at 676. Prior to *Iqbal*, we held that "personal involvement" included, as relevant here, "direct participation in the alleged violation[,] . . . gross negligence in the supervision of subordinates who committed the wrongful acts[,] and failure to take action upon receiving information that constitutional violations are occurring." *Patterson*, 375 F.3d at 229; *see also Back*, 365 F.3d at 127 (citing *Colon*, 58 F.3d at 873); *Hayut*, 352 F.3d at 753. We conclude that, even viewing the relevant evidence produced by the plaintiffs generously, Gagliardi is not individually liable for violating the plaintiffs' rights under §

74

1983. He neither created a hostile work environment through his own direct actions nor was grossly negligent in his supervision or investigation of subordinate officers who allegedly harassed the plaintiffs on the basis of sex.

Although the plaintiffs claim that Gagliardi created a hostile work environment through his direct actions, the record is devoid of specific allegations or evidence. The only meaningful conduct involves Raspardo. Gagliardi suspended Raspardo for four days following a car accident in which she admitted to being at fault. Gagliardi was also apparently involved—though Raspardo does not explain how—in the investigation into whether Raspardo had lied about her knowledge of Spanish. Finally, Gagliardi told Raspardo when she was first interviewed that if she were hired by the NBPD, "he was going to have sexual harassment problems with [her]." Defs.' App. 207. These three incidents are not sufficient to create a genuine dispute as to whether he created a hostile work

75

environment. Gagliardi is thus entitled to qualified immunity on the plaintiffs' direct claims.

The plaintiffs' primary allegation against Gagliardi, however, is that he allowed other NBPD officers, particularly Carlone, to sexually harass the plaintiffs. This claim reaches a substantially broader range of conduct because it encompasses treatment of the plaintiffs, and others in the NBPD, by Gagliardi's subordinates.

Gagliardi may not be held liable under § 1983 for grossly negligent supervision of his subordinates unless those subordinates have actually violated a plaintiff's constitutional rights. *Poe*, 282 F.3d at 134 ("Because the establishment of both the violation and the defense depend upon evaluating the harm inflicted and the individual responsibility of the accused public official, both the subordinate's and the supervisor's actions (or lack thereof) are relevant."). We concluded above that Steck, Panetta, and Paventi did not sexually harass the plaintiffs. We also held, on the basis of

the evidence presented, that a jury could conclude that Carlone sexually harassed Raspardo and presumably Russell,[26] but not Spring. Even if Carlone's misconduct did not amount to sexual harassment, however, his treatment of all NBPD officers and personnel is relevant to the extent Gagliardi was aware of it with respect to Spring and any other female officers and personnel, not just Russell and Raspardo. We nonetheless conclude, as explained below, that Gagliardi is entitled to qualified immunity because Gagliardi did not, as a matter of law, violate the plaintiffs' constitutional rights by failing to adequately supervise Carlone's interactions with them or by failing to adequately investigate and respond to reports concerning Carlone's allegedly improper behavior prior to his sexual harassment of Russell and Raspardo.

Under our pre-*Iqbal* case law, a failure to supervise subordinates and adequately inquire into complaints concerning

---

[26] This assumption is necessary where, as here, Carlone did not move for summary judgment with respect to Russell's claim of sexual harassment against him.

their behavior can yield supervisory liability in certain circumstances. *Id.* at 141. As we have explained, "for a supervisor to be liable under section 1983 for his failure to inquire, he must first have been on notice that his subordinate was prone to commit some unconstitutional or unacceptable behavior. Such notice could be actual (for example, awareness of prior [constitutional] deprivations in a related context), or it could be constructive . . . ." *Id.* In order to defeat a police supervisor's claim of qualified immunity, a plaintiff:

> must allege sufficient facts to raise a triable issue of fact as to whether [the supervisor] knew or should have known that there was a high degree of risk that [the harasser] would behave inappropriately with a woman during his assignment, but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk, and that failure caused a constitutional injury.

*Id.* at 142. The issue on appeal from a denial of qualified immunity then, is whether a plaintiff "has . . . proffer[ed] sufficient evidence to meet this standard." *Id.*

The only evidence Russell and Raspardo identify suggesting

78

that Gagliardi had reason to know that Carlone may have posed a risk of sexually harassing them is that the department previously investigated Carlone following allegations concerning improper comments and behavior toward female officers and personnel. However, the department's 2006 investigation into allegations that Carlone was harassing Officer Hayden concluded when Hayden explained that she did not feel that Carlone had behaved inappropriately. During the course of this investigation, it was also discovered that Carlone made an inappropriate joke about a female officer during roll call. Upon further investigation, the woman officer confirmed that Carlone had made the inappropriate comment but stated that she did not feel offended by it. Gagliardi and Paventi disciplined Carlone through verbal counseling after these investigations, and Paventi ordered Carlone not to pick up female officers in his patrol vehicle. When Carlone continued to do so, Paventi gave him another verbal warning. A December 2006

79

investigation also revealed that Carlone inappropriately used the MDT messaging system, an infraction for which Gagliardi suspended Carlone for two days and ordered Carlone to surrender two days of accrued holiday time.

These prior incidents of misconduct by Carlone were not sufficient to put Gagliardi on notice that Carlone was likely to sexually harass Russell and Raspardo. *Cf. Johnson*, 239 F.3d at 255 (holding that supervisors' knowledge of four assaults by a teacher prior to his assault of the plaintiff could constitute grossly negligent supervision). The nature of these incidents and of Gagliardi's response would not permit a reasonable jury to find "gross negligence or deliberate indifference," or to conclude that Gagliardi's response created "a high risk that [Carlone] would violate [Russell's and Raspardo's] constitutional rights." *Poe*, 282 F.3d at 140. Russell and Raspardo also suggest that Carlone should have been disciplined more harshly after these incidents and

conclude that the lack of such discipline ultimately led to Carlone's sexual harassment of them. The fact that Gagliardi did not fire Carlone earlier surely permitted Russell's and Raspardo's harassment to occur, but this is an insufficient basis to conclude that Gagliardi was grossly negligent in not terminating Carlone earlier or imposing other discipline.

There is also no evidentiary basis to conclude that Gagliardi knew that Carlone was sexually harassing Russell or Raspardo and impermissibly allowed this harassment to continue. The plaintiffs did not report sexual harassment of them by Carlone until after Gagliardi had already placed Carlone on administrative leave. Indeed, neither Russell nor Raspardo claims that Gagliardi was aware of Carlone's behavior toward her before that time. Nor have they presented any evidence suggesting that Gagliardi created or allowed to continue any policy of sexual harassment or otherwise witnessed or approved of acts of sexual harassment of other female

81

officers by Carlone.

It is undisputed that once Gagliardi became aware of allegations of Carlone's improper racial remarks to Officer Elias, he placed Carlone on administrative leave until the conclusion of that investigation. Gagliardi began a broader investigation into Carlone's conduct and contacted the prosecutor's office once he learned of Carlone's sexual misconduct involving Russell. Finally, shortly after the investigation began, Gagliardi demoted Carlone from Sergeant to Patrol Officer on the ground that he "used [his] supervisory position . . . to engage in an inappropriate, offensive and demeaning pattern of conduct against at least . . . two officers who were working under [his] command." Defs.' App. 68 ¶ 84, 109 ¶ 84. After the investigation concluded, Gagliardi recommended that Carlone be terminated.

Gagliardi's response to Carlone's behavior prior to the events complained of by the plaintiffs was not grossly negligent as a matter

of law, nor was his later investigation and ultimate discipline of Carlone. *See, e.g.*, *Hayut*, 352 F.3d at 753; *Colon*, 58 F.3d at 873. In any event, "[r]easonable supervisors confronted with the circumstances faced by [Gagliardi] could disagree as to the legality of his inaction." *Poe*, 282 F.3d at 146. Although Carlone's behavior toward Russell and Raspardo is surely offensive and regrettable, "[t]o find [Gagliardi] ineligible for immunity solely because [Carlone] acted unlawfully seems patently unfair as well as illogical." *Id.* at 134.

Gagliardi thus did not violate the plaintiffs' constitutional rights either directly or as a supervisor. He is entitled to qualified immunity on the plaintiffs' direct and supervisory liability claims of sexual harassment.

*F. The Plaintiffs' Disparate Treatment Claims*

Finally, the plaintiffs assert disparate treatment claims under § 1983 against the individual defendants other than Carlone. Such a § 1983 claim for sex discrimination is analyzed under the burden-

83

shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), utilized in Title VII claims. *See Demoret*, 451 F.3d at 150-51. The plaintiff must first establish a *prima facie* case by showing that: "(1) she is a member of a protected class; (2) her job performance was satisfactory; (3) she suffered adverse employment action; and (4) the action occurred under conditions giving rise to an inference of discrimination." *Id.* at 151 (citing *McDonnell Douglas*, 411 U.S. at 802). Once the plaintiff makes such a showing, the burden shifts to the defendant employer to provide a legitimate, non-discriminatory reason for the action. *Id*. If the defendant is able to make such a showing, "the burden shifts back to the plaintiff to prove discrimination, for example, by showing that the employer's proffered reason is pretextual." *Id.* Notably, in disparate treatment cases brought pursuant to § 1983, "liability for an Equal Protection Clause violation . . . requires personal involvement by a defendant, who must act with discriminatory purpose." *Reynolds*, 685 F.3d at

84

204.

Individual liability under § 1983 for disparate treatment requires us to examine each individual defendant's actions to determine whether he treated the plaintiffs disparately on the basis of sex. *See id.* at 204-06. This task is especially difficult here where the plaintiffs' allegations are not entirely clear as to which supervisors disciplined them at particular times and for particular conduct. Because most of the plaintiffs' allegations do not assert adverse employment actions, however, we find it unnecessary to examine each defendant separately and instead conclude that most of the plaintiffs' claims fail on the third prong of the *McDonnell Douglas prima facie* case.

As to that prong, "[a] plaintiff sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment." *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000). A materially

adverse change in working conditions "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* (internal citation and quotation marks omitted). Examples of actionable adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less important title, a loss of important benefits, or significantly reduced responsibilities. *See id.; see also Demoret*, 451 F.3d at 151.

With the possible exception of the administrative discipline Raspardo and Spring suffered as a result of their motor vehicle accidents, none of the treatment complained of constitutes an adverse employment action. *Compare Galabya*, 202 F.3d at 640-41 (holding that assignment to a different school or classroom was not an adverse employment action), *and Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997) (determining that loss of an office and phone privileges was not a materially adverse employment action), *with Terry v. Ashcroft*, 336 F.3d 128, 142-45 (2d

Cir. 2003) (deciding that a reasonable factfinder could conclude that loss of firearm privileges and driving privileges for a law enforcement officer was an adverse employment action). The plaintiffs' remaining claims of unequal treatment, such as minor reprimands for tardiness, improper attire, and miscommunications regarding use of sick leave and personal days, are not adverse actions and cannot give rise to a § 1983 claim on a theory of disparate treatment.

Assuming that Raspardo's and Spring's claims regarding their loss of driving privileges and requirement to walk their nighttime patrols constitute adverse employment actions, *see Terry*, 336 F.3d at 145, they ultimately fail on the fourth prong of the *McDonnell Douglas prima facie* case. So, too, with Russell's sanction concerning a motor vehicle collision, a showing of disparate treatment "is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case." *Ruiz v. Cnty. of Rockland*,

609 F.3d 486, 493 (2d Cir. 2010). Raising such an inference, however, requires the plaintiff to show that the employer treated him or her "less favorably than a similarly situated employee" outside of the protected group. *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000); *see also Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) ("A plaintiff relying on disparate treatment evidence must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." (internal quotation marks omitted)).

A similarly situated employee is one "similarly situated in all material respects" to the plaintiff. *Graham*, 230 F.3d at 39 (internal quotation marks omitted). This does not mean that the plaintiff and the compared co-employees must be identical. *Id.* at 40. In the context of employee discipline, however, the plaintiff and the similarly situated employee must have "engaged in comparable conduct," that is, conduct of "comparable seriousness." *Id.* (internal

88

quotation marks omitted).

Here, the plaintiffs assert that male officers who were involved in similar car accidents were treated more favorably because the male officers were not disciplined as harshly as the plaintiffs. We address each plaintiff's allegations concerning her alleged unequally harsh treatment in turn.[27]

Russell claims that she was treated unfairly after a minor collision with an "Officer Sloate." She maintains that her patrol car

---

[27] We acknowledge that this Court has at times described the issue of whether an alleged comparator is sufficiently similarly situated to a plaintiff in the Title VII context as "a question of fact for the jury." *Mandell*, 316 F.3d at 379. As such, it is unsettled whether we can review a district court's determination that genuine disputes of material fact preclude granting summary judgment on a plaintiff's disparate treatment claims because of a lack of comparator evidence. *Cf. Plumhoff*, 134 S. Ct. at 2019 ("[D]eciding legal issues . . . is a core responsibility of appellate courts, and requiring appellate courts to decide such issues is not an undue burden."). We note again that Title VII frameworks do not always fit neatly into § 1983 claims. In the context of § 1983 claims, denying appellate review of the "factual question" of whether an alleged comparator is sufficiently similar to a plaintiff for the purposes of a disparate treatment claim would effectively insulate all such claims from review, exposing government officials to discovery and trial on only these claims. Thus, we may address it on appeal. Here, the complete absence of symmetrical comparator evidence compels the grant of summary judgment on these claims. *See Scott*, 550 U.S. at 380 (holding that this Court may resolve the legal question concerning the alleged constitutional violation, even if such resolution relies on a fact-bound inquiry, and need not accept plaintiffs' allegations where they are contradicted by the record).

did not collide with Officer Sloate's patrol car, and alleges that Carlone assisted Officer Sloate in writing and editing his statement concerning the accident. She admits that she received a "Supervisor's Warning" from an Officer Woodruff, not a defendant in this case, who investigated the accident. Defs.' App. 56 ¶ 47, 105-106 ¶ 47. Russell does not allege that Officer Woodruff acted improperly in his investigation or imposition of discipline, and this type of punishment appears consistent with the other punishments meted out for similar accidents. Russell also failed to file a grievance concerning discipline imposed following this incident. Russell appears to claim only that Carlone engaged in disparate treatment by assisting Officer Sloate in writing and editing his statement. This conduct does not constitute an adverse action, and there is no allegation or evidence that Carlone failed to assist other officers in writing and editing statements and thus acted disparately toward Russell. Therefore, Russell has not established that Carlone treated

her disparately on the basis of sex in this instance.[28]  Liability cannot be imputed to Gagliardi without an underlying constitutional violation.  *See Poe*, 282 F.3d at 134, 142.  Thus, the defendants have not violated Russell's constitutional right to equal protection on this basis and are entitled to qualified immunity.

As to Raspardo's claim, the undisputed evidence is that her motor vehicle accident was extremely severe.  The accident caused $14,000 of damage to her police vehicle and substantial damage to the other vehicle involved, whose occupants were a mother and child taken to the hospital for emergency care, and kept Raspardo out of work with injuries until May 2, 2008.  Raspardo does not appear to contend on appeal that she was not at fault for this accident or that the damage caused by the accident was not extreme; instead, she argues that the suspension of her driving privileges and requirement that she walk a beat constituted disparate treatment.

---

[28] We offer no conclusion as to this behavior in the context of Russell's sexual harassment claim against Carlone, which continues in the district court.

Raspardo has set forth no similarly situated comparator to permit this Court to conclude that the defendants treated Raspardo disparately on the basis of her sex following her car accident. The accident reports submitted by plaintiffs delineating other incidents describe accidents that occurred at low speeds and resulted in minimal property and automobile damage and no injuries. The accident reports presented, and the discipline for the officers involved, are not sufficiently similar to Raspardo's serious accident to support disparate treatment.[29] Raspardo has thus failed to identify a sufficiently similar comparator to establish as a matter of law that she was disparately treated following her accident. Because there was no underlying constitutional violation, liability cannot be

[29] Raspardo alleges that an "Officer Bleau" drove through a red light, "totaling another car that had a family inside [the vehicle]," but that he never had to go to driver retraining or was disciplined. We cannot conclude from this vague statement that "Officer Bleau" was sufficiently similarly situated to Raspardo. Additionally, there is no evidence substantiating this claim in the record. Although we must view the facts in the light most favorable to the plaintiffs and take the allegations and facts as adduced by the plaintiffs, we need not accept conclusory allegations that are either contradicted by or lack support in the record. *See Scott*, 550 U.S. at 380.

imputed to Gagliardi or imposed on the other individual defendants. Therefore, the defendants have not violated Raspardo's constitutional rights and are entitled to qualified immunity on this claim.

Spring's claim presents the closest case. Spring admits that she was involved in an accident in her patrol car in February of 2008 when she struck the rear of a vehicle. After a "Sergeant Portalatin" investigated the accident and determined (with the help of Spring's own admission) that Spring was at fault for the accident, a "Captain Beatty" issued Spring a written reprimand and informed her that she must participate in driving training administered by the department.[30] Spring admits that, after Beatty's reprimand, she "could not operate a police car until that training was completed" and that, "[a]s a result of being unable to operate a police car, [she] had to walk a beat." Defs.' App. 61 ¶ 56, 107 ¶ 56. Spring does not

---

[30] It appears that Defendant Steck had limited involvement in this investigation and ensuing disciplinary action; Spring does not cite his behavior as objectionable.

appear to challenge the findings of fault, which were made by officers who are not defendants. She instead contends that she was forced to walk a patrol on the fourth shift in an area of high crime and that her supervisors repeatedly ensured that she did not use a police vehicle. She attributes this alleged punishment to Defendant Paventi, who the evidence indicates gave specific instructions to the supervisory staff that they would walk beats if post-accident beat officers were found in patrol cars, and her direct supervisor, not a defendant in this case, who interpreted Paventi's instruction as applying to Spring. She emphasizes that she was the only officer ever required to walk a beat on the late-night fourth shift. Because Spring concedes that an "Officer Beatty" assigned the punishment in this case and specifically told Spring that she would not be permitted to drive a police vehicle and would have to walk a beat until she completed driver retraining, we understand her to be making a claim of unequal enforcement of penalties against Paventi.

Spring has failed, though, to identify a sufficiently similarly situated male comparator with whom to compare Paventi's penalty enforcement. Spring has identified no male officer who was specifically admonished, as she admits she was, by a non-defendant officer not to ride in a police vehicle and required to walk a beat, and who was subsequently specifically permitted by Paventi to avoid this punishment. Indeed, the alleged similar comparators, for the most part, were not even supervised by Paventi, and Spring does not claim that Paventi failed to enforce their punishments against them or otherwise generally permitted post-accident officers to ride in police vehicles during this time. Thus, even viewing the evidence most favorably to Spring, Spring has failed to establish that Paventi treated her more harshly with respect to enforcing her driver retraining and walking a beat penalties assigned by another officer.[31]

---

[31] Although the plaintiffs allege generally on appeal that male officers were not required to walk beats following car accidents, this assertion is partially contradicted by Spring's own admission that at least one male officer ("Officer Jared Barseleau") was required to walk a beat after being in car accidents, and

As such, Paventi did not violate Spring's constitutional rights and is entitled to qualified immunity. Because we have held that there was no underlying constitutional violation, there is also no supervisory liability. *See Poe*, 282 F.3d at 134. Thus, Gagliardi is entitled to qualified immunity on these claims.

Because the plaintiffs have not established that the individual defendants treated the plaintiffs differently than they treated similarly situated male officers, the defendants have not violated the plaintiffs' constitutional rights as a matter of law, and the plaintiffs' disparate treatment claims fail. The defendants are therefore entitled to qualified immunity on these claims.[32]

**CONCLUSION**

For the foregoing reasons, we AFFIRM in part and REVERSE

the undisputed evidence that beat officers were assigned police vehicles 83% of the time.

[32] Because Russell and Spring have failed to provide any information about allegedly similarly situated comparators with reference to Gagliardi's denial of their requests for light duty, they have failed to establish disparate treatment on that basis and we need not address these allegations further.

in part the district court's denial of the individual defendants' motions for summary judgment and REMAND for proceedings consistent with this opinion. Except for Raspardo's hostile work environment claim against Carlone, the five individual defendants are entitled to qualified immunity on the § 1983 claims.

It is worth noting, once again, that this appeal only considers the hostile work environment and disparate treatment claims against the individual defendants under 42 U.S.C. § 1983. The claims against the City of New Britain and its police department under Title VII and § 1983 continue before the district court. Russell's hostile work environment claim against Carlone under § 1983 also remains pending in the district court as Carlone did not seek summary judgment as to that claim.

97