# United States Court of Appeals
## For the First Circuit

No. 05-1527

QUINCY COMMERCE CENTER, LLC
and OMLC, LLC,

Plaintiffs, Appellants,

v.

MARITIME ADMINISTRATION, WILLIAM G. SCHUBERT,
MARITIME ADMINISTRATOR IN HIS OFFICIAL CAPACITY,
K. SPILLANE, LLC, MYRON BOWLING AUCTIONEERS,
PERFECTION MACHINERY, and MARCH FOURTH, LLC,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]

Before

Howard, Circuit Judge,

Coffin and Campbell, Senior Circuit Judges.

Edward Foye with whom Christopher Weld, Jr., Howard M. Cooper
and Todd & Weld LLP were on brief, for appellants.
Eric D. Miller, Attorney, Appellate Staff, Civil Division,
United States Department of Justice with whom Peter D. Keisler,
Assistant Attorney General, Michael J. Sullivan, United States
Attorney and Anthony J. Steinmeyer, Attorney, Appellate Staff,
Civil Division, United States Department of Justice, were on brief,
for appellees, Maritime Administration, et al.
Christopher J. Cunio with whom Harry L. Manion, III, Frank A.
Marinelli, Jaimie A. McKean, and Cooley Manion Jones LLP were on

brief, for appellees K. Spillane, LLC and March Fourth, LLC.
     Jay T. Farraher with whom Paul T. Fox, Gretchen N. Miller and Greenberg Traurig, LLP were on brief, for appellees, Perfection Machinery Sales, Inc., and Myron Bowling Auctioneers.

———————————

June 9, 2006

———————————

**HOWARD**, **Circuit Judge**.  Plaintiff Quincy Commerce Center, LLC ("QCC"), has brought this appeal to challenge the district court's entry of summary judgment against it on its claims under the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 et seq.  QCC argues that the Maritime Administration of the United States ("MARAD") and William G. Schubert, MARAD's Administrator (in his official capacity), violated the Merchant Marine Acts of 1936 and 1970 ("MMA"), 46 U.S.C. app. §§ 1101 et seq., and the Coastal Zone Management Act of 1972 ("CZMA"), 16 U.S.C. §§ 1451 et seq., and otherwise acted unlawfully, in the course of auctioning off the assets of the defunct Fore River Shipyard in Quincy, Massachusetts.  Plaintiff-intervenor OMLC, Inc. ("OMLC"), also appeals to challenge the court's entry of summary judgment against it on its claim that its exclusion from the auction was arbitrary and capricious.  The court explained its rulings in a comprehensive, 34-page memorandum and order.  See Quincy Commerce Ctr., LLC v. Maritime Admin., Civil No. 03-10307-NG (D. Mass. filed Feb. 25, 2005).  We draw heavily on the court's fine work in setting forth the background.

Plaintiffs' claims challenged the legality of the January 16, 2003 outcry auction of the real estate on which the shipyard was located, and certain personal property stored there.  QCC asserts standing to bring its claims because it was an unsuccessful bidder for both the realty and personalty.  OMLC premises its standing on the fact that it sought, but was denied, eleventh-hour permission

-3-

to bid for the realty. As set forth above, the primary defendants are MARAD, the federal agency that oversaw the auction, and its administrator. The Verified Second Amended Complaint also invoked Fed. R. Civ. P. 19 to name as defendants K. Spillane, LLC ("Spillane"), the winning bidder for the realty; March Fourth, LLC ("March Fourth"), a corporate affiliate of Spillane and assignee of Spillane's rights to the realty; Perfection Machinery Sales ("Perfection"), the winning bidder for the personalty; and Myron Bowling Auctioneers ("Myron Bowling"), Perfection's bidding partner. Michael Fox International, Inc. ("Fox"), was the auctioneer, but is not a named party.

The Fore River Shipyard was founded in 1884 and has played a historic role in the United States shipbuilding industry. In 1986, however, the declining shipyard was closed and sold to the Massachusetts Water Resource Authority, which eventually conveyed it to Massachusetts Heavy Industries, Inc. ("MHI"). In 1995, MHI asked MARAD to guaranty a loan to finance the shipyard's reopening. MARAD initially balked because, in its view, the project did not meet the statutory requirement that it be "economically sound." 46 U.S.C. app. § 1274(d)(1)(A). But in the Coast Guard Authorization Act of 1996, Congress enacted legislation which impelled MARAD to provide the guaranty. See Pub. L. No. 104-324, § 1139(b), 110 Stat. 3901, 3989. In 1997, MARAD guaranteed a $55 million loan that MHI obtained from Fleet Bank, taking a senior mortgage on the real

-4-

estate on which the shipyard is located and a senior security interest in the shipyard's personalty.

On December 31, 1999, MHI defaulted on its loan, and on February 25, 2000, MARAD paid Fleet $59.1 million under its guarantee. Soon thereafter MARAD took possession of the realty and personalty. On March 13, 2000, MHI filed for bankruptcy under chapter 11. In August 2000, MARAD petitioned the bankruptcy court to lift the chapter 11 automatic stay so that it might sell the assets of which it had taken custody. In support of its application, MARAD submitted a declaration from Paul Stott, an expert in the shipbuilding industry, who averred that reopening the shipyard was not economically feasible because the costs of restoration at the Fore River site would be prohibitive, and because of reduced worldwide demand. The bankruptcy court granted MARAD's petition and authorized MARAD to sell the shipyard's assets after the end of the year.

MARAD first advertised the property in October 2000. The agency received several offers in the year that followed, but all proved to be unsatisfactory. In early 2002, MARAD began actively soliciting offers from businesses that contemplated using the facility to scrap ships. Local officials strongly objected, citing environmental concerns, and MARAD abandoned this plan. Ultimately, in August 2002, MARAD decided to sell the property at a public auction and hired Fox to serve as auctioneer.

MARAD publicized the auction by means of newspaper and internet advertisements and direct mailings, and made a "Property Information Package" available to parties interested in bidding. The information package explained the rules of the auction and that the realty would be sold separately from the personalty, which would have to be removed from the property "immediately [after the auction] or at such other times as permitted by MARAD and [Fox]." A party wishing to bid first had to become a "potential bidder" by demonstrating to MARAD's satisfaction that it had the financial wherewithal to purchase the property. Next, a potential bidder had to become "qualified" by submitting a sealed bid and a deposit. Any bid for the realty had to include a "statement of intent" setting forth "the bidder's plans to use the real property and the projected impact on employment, the environment, and business and tax revenue in the locality." In formulating the auction rules, MARAD retained considerable authority. The rules informed bidders that MARAD "reserves the right to share [bidders' intentions] with local elected officials and [to] disqualify any bidders whose plans MARAD deems unsatisfactory." The rules also stated:

> The Sales Agent [Fox] may determine, in its business judgment, but only upon receipt of MARAD's consent, which Qualified Bid(s), if any, is the highest or otherwise best offer, and may reject at any time, any bid that, in the Sales Agent's sole discretion, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bidding Procedures, or the terms and conditions of sale, or (iii) contrary to the best interests

> of MARAD or the United States of America. At any time before or at the Sale, the Sales Agent may impose such other bidding procedures and terms and conditions as it may determine are in the best interest of [MARAD] and other parties in interest, and may modify or amend these procedures.

The sale was conducted in two stages. MARAD first required that written bids be submitted by December 31, 2002, although it reserved the right to extend, and did extend, that deadline to the date of the auction itself. Second, on January 16, 2003, MARAD engaged Fox to preside over a live public auction at which the written bids were unsealed and qualified bidders were afforded the opportunity to raise their bids beyond the highest written bids. In the end, MARAD qualified six entities to bid on the realty and two to bid on the personalty. No qualified bidder stated an intention to use the property for ship scrapping. Nor did any qualified bidder state explicitly that it intended to use the property to run a shipyard or ship repair facility, although QCC stated that it contemplated "redevelop[ing]" the site as a "vital center of commercial activity" including "marine industry," and Spillane stated that it was contemplating "marine related uses." QCC says, however, that MARAD knew, or at least should have known, that it truly intended to use the assets for merchant marine purposes, while Spillane did not.

On December 31, 2002, QCC submitted a written bid of $1.5 million for the personalty. On January 13, 2003, Spillane submitted

-7-

a written bid of $9 million for the realty. On the night before the auction, MARAD and Fox determined that these were the bids that the winning bidders would have to beat. That same night, in response to a written request from Perfection that the winning bidder for the personalty be afforded 18 months to remove it (or to abandon it at the shipyard site), MARAD and Fox also agreed to give the winning bidder a 12-months remove-or-abandon window. The provision of this grace period was announced at the beginning of the auction, although QCC alleges (and we shall assume for purposes of this appeal) that it was communicated by a Fox representative to Perfection, which had business ties to Fox, at some point prior to its public announcement.

On the morning of January 16, 2003, within an hour of the time at which the auction was scheduled to begin, a representative of OMLC, which had not been qualified to bid by MARAD, appeared at the auction site and stated that OMLC wished to bid on the realty. MARAD declined to qualify OMLC. MARAD says that it based its disqualification decision on OMLC's failure to submit written documentation of its financial ability to purchase the property, and the fact that OMLC's representative stated that the company wished to use the site for "recycling," which MARAD understood to mean ship scrapping. OMLC responds that it has evidence that these explanations are pretextual.

At the auction, Fox failed to elicit any bids for the realty higher than Spillane's $9 million bid. QCC's bid was approximately $3.3 million lower. Accordingly, MARAD declared Spillane the winner and signed a memorandum of sale documenting its decision. Perfection, however, doubled QCC's $1.5 million bid and won the personalty with its bid of $3 million. Spillane assigned its rights to the realty to March Fourth, which has since spent millions of dollars redeveloping the property. Perfection has resold most of the personalty to third parties who are not involved in this litigation.

In February 2003, QCC brought this lawsuit, and OMLC later intervened. The suit sought to enjoin or to nullify the sales of the realty and personalty. QCC's primary argument was that, in awarding the shipyard's assets to the highest bidders and not to QCC, MARAD had violated the APA by neglecting its statutory duty under the MMA to foster a merchant marine. See 46 U.S.C. app. § 1101 ("It is necessary for the national defense and development of its foreign and domestic commerce that the United States shall have a merchant marine . . . supplemented by efficient facilities for shipbuilding and repair. It is declared to be the policy of the United States to foster the development and encourage the maintenance of such a merchant marine."). QCC premised this claim on a foundational allegation that MARAD knew, or should have known,

that QCC intended to use the assets for shipbuilding and ship repair, and that Spillane did not.

QCC also asserted that MARAD had violated the APA by proceeding with the sale of the personalty to Perfection even though its auctioneer had disclosed the 12-month remove-or-abandon grace period to Perfection, but not to other bidders, prior to the auction. During the course of the pretrial proceedings, QCC set forth an additional (and unpleaded) claim that, because MARAD could have sold the shipyard's assets to QCC, thereby ensuring that they remained devoted to marine uses, MARAD had violated the APA by failing to provide the Massachusetts Office of Coastal Zone Management with a formal determination allegedly required by the CZMA: that the sale of the assets to the high bidders, irrespective of whether the assets would be put to marine uses, was "consistent to the maximum extent practicable with the enforceable policies of approved State management programs." 16 U.S.C. § 1456(c)(1)(A); see also 15 C.F.R. §§ 930.33-34 & 36 (requiring consistency determinations if a contemplated activity affects a State's coastal zone or resource). Finally, OMLC claimed that its exclusion from the bidding process violated the APA.

Following the denial of QCC's request for preliminary injunctive relief, and after discovery concluded, the district court entered summary judgments in favor of defendants. Insofar as is relevant, the court first concluded, as a matter of law, that MARAD

had met its statutory obligations under the MMA by rationally and reasonably concluding that it would not be feasible to sell the shipyard assets for merchant marine purposes, and that, in any event, QCC's and Spillane's statements of intent did not put MARAD on notice that QCC was more likely to put the assets to merchant marine purposes than Spillane. Next, the court determined that, even if Fox had selectively disclosed the 12-month remove-or-abandon amendment to Perfection prior to the auction, MARAD did not act arbitrarily or capriciously in approving the sale to Perfection, the fairness of which was not materially undermined by the disclosure. The court also summarily rejected QCC's APA claim arising out of the CZMA under the prudential standing doctrine because QCC was not within the zone of interests that the CZMA sought to protect. Finally, the court ruled MARAD had acted lawfully in declining to qualify OMLC as a bidder because it reasonably understood that OMLC was contemplating ship scrapping and permissibly decided not to sell to such a buyer.

On appeal, QCC renews its arguments that MARAD disregarded its statutory duties under the MMA and CZMA when it sold the shipyard assets to the highest bidders and without the CZMA consistency determination that would have led MARAD to conclude that QCC's bid was to be preferred as a matter of federal law. QCC also contends that the district court applied a standard of review that was inappropriately deferential to the agency. Defendants respond

that, under the circumstances of this case, the statute does not impose on the agency the imperative claimed by QCC; that MARAD satisfied any statutory obligations it might bear; that it is the administrative record alone, and not background evidence such as the knowledge and thought processes of MARAD officials, that should inform our inquiry into the lawfulness of MARAD's conduct; that the district court applied the correct standard of review; and that, in any event, QCC has forfeited its right to challenge the sales on the ground that it planned to put the shipyard assets to marine uses because it failed to apprise MARAD of its intentions and, more importantly, its legal positions prior to the sales.

We think it an interesting question whether MARAD lawfully could have sold the shipyard assets to the high bidders, and without a CZMA consistency determination, had QCC argued to the agency prior to the auction that it was entitled to preferred bidder status because it was the only bidder planning to put the assets to merchant marine purposes. But these are not questions that the record leads us to ask. Read in a light most favorable to QCC, the record supports our asking only whether MARAD violated the law when it sold the assets to the high bidders, and without a CZMA consistency determination, despite the existence of some background evidence -- i.e., evidence outside the administrative record -- suggesting that QCC's statement of intent (which, again, was materially identical to Spillane's with respect to the marine use

issue) was sincere and that Spillane's was not.  The answer to this question is no.

The public record MARAD created in, for example, its bankruptcy court filings and property information package put interested parties on at least constructive notice that MARAD did not foresee an economically viable shipyard operating again at the Fore River site, and that it planned to offset the large financial losses suffered under the reluctantly issued 1997 guaranty by selling to the highest bidders who did not contemplate uses to which local officials would object.  But despite being on constructive notice of MARAD's intentions, QCC never told MARAD that, under the circumstances, the MMA required it to be treated as a preferred bidder, or that the CZMA required a consistency determination that would have alerted MARAD to QCC's preferred status.  In our view, these omissions preclude the MMA and CZMA claims made by QCC under the APA.

Ordinarily, a party forfeits its right to challenge agency action post hoc if it has failed to apprise the agency of its positions in a timely manner.  Cf., e.g., Dep't of Trans. v. Public Citizen, 541 U.S. 752, 764-65 (2004) (declining to entertain petitioners' argument that a federal agency inadequately considered alternatives to its proposed action because petitioners had not presented those alternatives to the agency); Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 553

-13-

(1978) (persons challenging a federal agency action must "structure their participation so that it . . . alerts the agency to the [parties'] position and contentions"); <u>Valley Citizens for a Safe Env't</u> v. <u>Aldridge</u>, 886 F.2d 458, 462-63 (1st Cir. 1989) (similar); <u>see also Honeywell Int'l, Inc.</u> v. <u>EPA</u>, 372 F.3d 441, 449 (D.C. Cir. 2004). We believe that enforcement of this forfeiture principle is appropriate here because the relief sought would have far-reaching implications for third parties who have relied on the presumed legitimacy and finality of the auction process, and who have invested resources and ordered their affairs accordingly. <u>Cf.</u> <u>Dir., Office of Workers' Comp. Programs</u> v. <u>North Am. Coal Corp.</u>, 626 F.2d 1137, 1143 (3d Cir. 1980) (restraint by courts asked to review agency action under the APA "is particularly important in a case with far-reaching implications" where the agency did not have a timely opportunity for meaningful consideration of the objecting party's position prior to taking action). If QCC believed that public policy required MARAD to prefer QCC as a bidder, it was obliged to notify MARAD of its belief at a time when MARAD could meaningfully consider the issue and take favorable action without harming the interests of others. Clearly, the time for such notice was prior to the auction.

Of course, the situation would be different had QCC lacked effective notice of MARAD's contemplated action, or had QCC lacked an opportunity to make its positions known to the agency. <u>See</u>

Honeywell, 372 F.3d at 449. Likewise, it would be different in circumstances where the illegality of the agency's actions is so obvious as to constitute a patent violation of the agency's primary responsibility to act in accordance with federal law. See Public Citizen, 541 U.S. at 765. But QCC does not argue either that it lacked an opportunity to air its views or that the case presents exceptional circumstances warranting relief from forfeiture. In fact, QCC fails to present any developed response to the forfeiture argument raised by Spillane and March Fourth in its brief other than to say that, in light of the background evidence, MARAD was on notice of its intentions. But this is like saying that, even in the absence of an objection, a decision to admit evidence at trial should be subject to challenge on appeal if the trial judge had reason to know, as a factual matter, that the evidence was inadmissible. The efficiency and fairness problems with applying such a principle to the informal adjudications of a federal agency are so obvious that they do not require further discussion.

In any event, we see no basis in the record for relieving QCC of its forfeiture. As we have stated, MARAD's decision to sell to the highest bidders who contemplated uses that were not objectionable to local authorities could not have come as a surprise to QCC. Moreover, prior to the auction, MARAD not only permitted, but it actually required, bidders to make written submissions which could and should have put the agency on notice of the bidders'

-15-

intentions and, presumably, relevant legal views. And finally, while the merits of QCC's statutory arguments are interesting, they are far from being so one-sided as to convince us that there has been a clear violation of the MMA or CZMA under the circumstances of this case.

We recognize that we have taken a somewhat different tack than the district court in rejecting QCC's APA claims which arise out of the MMA and CZMA. But so long as our ruling does not cause us to exceed our article III warrant, we may affirm on any ground supported by the record. See, e.g., In re Miles, 436 F.3d 291, 293 (1st Cir. 2006). Here, we choose to base our decision on forfeiture because the record clearly supports such a ruling and because we think the merits of QCC's legal arguments are better left unaddressed unless and until a situation arises in which MARAD has had an opportunity to consider them prior to taking a challenged course of action. See North Am. Coal Corp., 626 F.2d at 1143.

The remaining appellate arguments warrant little discussion. Given the absence, even now, of any substantial indication that QCC would have approached or bettered Perfection's bid for the personalty had it learned the night before the auction that it would have 12 months to remove or abandon the property, the district court correctly concluded that MARAD did not act arbitrarily or capriciously in permitting the sale to Perfection to be completed. So too did the court correctly conclude that MARAD

-16-

did not violate the APA in denying OMLC's last-minute request to qualify as a bidder for the realty. The evidence OMLC offers to show that the issue is trialworthy – evidence that OMLC's representative stood ready to provide all the written documents explicitly required by the property information package; that MARAD issued its decision prior to completing a telephonic inquiry to OMLC's banker which would have confirmed the company's ability to pay more than the high written bid; and that MARAD officials misunderstood OMLC's representative to be referring to ship scrapping when he stated that he was interested in using the site for "recycling" -- suggest, at most, that MARAD excluded OMLC for reasons that in hindsight may have proved unsound. But even if this is the case, it must be borne in mind that the decision to exclude was made in a setting where OMLC, through its delay and late entry into the bidding process, gave MARAD less than an hour to make the complex evaluation of its qualifications as a bidder. In our view, no reasonable factfinder could conclude that a decision to err on the side of caution -- and not to risk losing the opportunity to sell the assets to bidders with whom MARAD had become comfortable -- was arbitrary or capricious under the circumstances.

Affirmed.